# United States Court of Appeals
## For the First Circuit

Nos. 12-2364, 12-2367

UNITED STATES,

Appellee,

v.

WENDELL RIVERA-RUPERTO,
a/k/a Arsenio Rivera,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

H. Manuel Hernández for appellant.
Robert J. Heberle, Attorney, Public Integrity Section, Criminal Division, U.S. Department of Justice, with whom Francisco A. Besosa-Martínez, Assistant United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States Attorney, were on brief, for appellee.

January 13, 2017

**THOMPSON**, **Circuit Judge**. This case arises out of a now-familiar, large-scale FBI investigation known as "Operation Guard Shack," in which the FBI, in an effort to root out police corruption throughout Puerto Rico, orchestrated a series of staged drug deals over the course of several years.[1] For his participation in six of these Operation Guard Shack drug deals, Defendant-Appellant Wendell Rivera-Ruperto stood two trials and was found guilty of various federal drug and firearms-related crimes. The convictions resulted in Rivera-Ruperto receiving a combined sentence of 161-years and 10-months' imprisonment.

Although Rivera-Ruperto raises similar challenges in his appeals from the two separate trials, each trial was presided over by a different district judge. Thus, there are two cases on appeal, and we address the various challenges today in separate opinions.[2] In this present appeal from the first trial, Rivera-Ruperto argues that the district court committed reversible errors when it: (1) denied his claim for ineffective assistance of counsel during the plea-bargaining stage; (2) failed to instruct the jury that it was required to find drug quantity beyond a reasonable

---

[1] See, e.g., United States v. Navedo-Ramirez, 781 F.3d 563 (1st Cir. 2015); United States v. González-Pérez, 778 F.3d 3 (1st Cir. 2015); United States v. Diaz-Castro, 752 F.3d 101 (1st Cir. 2014).

[2] Co-defendants Miguel Santiago-Cordero and Daviel Salinas-Acevedo were tried along with Rivera-Ruperto at his second trial, and we address their challenges in our companion decision as well.

doubt; (3) either declined to consider or rejected his sentencing manipulation claim; and (4) sentenced him to a grossly disproportionate sentence in violation of the Eighth Amendment.

For the reasons stated below, we affirm the district court.

**OVERVIEW**

We keep our summary of the facts brief for now, saving the specific details related to Rivera-Ruperto's various challenges for our later discussion.

Rivera-Ruperto provided armed security during six Operation Guard Shack sham drug deals, which occurred on April 9, April 14, April 27, June 9, June 25, and September 16 of 2010.[3] Each of the sham deals followed the same pattern. They involved undercover officers posing as sellers and buyers of fake cocaine, and took place at FBI-monitored apartments wired with hidden cameras. The April 9 and April 14 deals each involved 12 kilograms of fake cocaine, the April 27 and June 9 deals each involved 8 kilograms of fake cocaine, and the June 25 and September 16 deals each involved 15 kilograms of fake cocaine. On top of rendering armed security services, Rivera-Ruperto brought along with him

---

[3] Although Rivera-Ruperto was not a police officer, he was invited to participate in Operation Guard Shack after he misrepresented himself to the FBI's confidential informant as a prison corrections officer.

- 3 -

additional recruits.[4]  And at the April 27 deal, Rivera-Ruperto did even more; he sold a handgun, including magazines, to a confidential FBI informant posing as a drug dealer.  For his services, Rivera-Ruperto received a payment of $2,000 for each of the deals, except for the September 16 deal, for which he received $3,000.

The government charged Rivera-Ruperto under three separate indictments (two on September 21, 2010 and one on September 23, 2010) for his illegal participation in the six sham drug deals.[5]  For each of the transactions, the indictments charged Rivera-Ruperto with one count each of conspiracy and attempt to possess with intent to distribute a controlled substance, as well as possession of a firearm in relation to a drug trafficking crime. Additionally, Rivera-Ruperto was charged with possessing a firearm with an obliterated serial number during the April 27 deal.

Rivera-Ruperto's case proceeded to trial after plea negotiations with the government failed -- a point of contention

---

[4] Among those Rivera-Ruperto recruited, at least one was a police officer.

[5] On September 21, 2010, Rivera-Ruperto was indicted for his participation in the April 14, April 27, June 9, and June 25, 2010 deals.  On the same day, the government separately indicted Rivera-Ruperto for his participation in the April 9, 2010 deal. Superseding indictments were later filed, but the charges remained the same.  Rivera-Ruperto was then indicted a third time on September 23, 2010 for his participation in the final September 16, 2010 deal.

that we get to shortly. For purposes of trial, the first September 21 indictment (which charged Rivera-Ruperto for the April 14, April 27, June 9, and June 25 deals) and the September 23 indictment (which charged him for the September 16 deal) were consolidated and tried together. A jury found Rivera-Ruperto guilty of all charges and the district judge sentenced him to 126-years and 10-months' imprisonment. It is this first trial which is the topic of the present appeal. As we discuss in more detail below, Rivera-Ruperto takes issue both with the judge's jury instructions and with the sentence he ultimately received.

Over defense counsel's objections, the second September 21, 2010 indictment (which charged Rivera-Ruperto for his involvement in the transaction on April 9, 2010 only) was tried several months later before a different district judge. After a second jury found Rivera-Ruperto guilty on all counts, Rivera-Ruperto received a 35-year sentence of imprisonment.

Rivera-Ruperto, who is presently serving his combined sentence of 161 years and 10 months, now timely appeals. Putting aside, as we are required to do, whatever misgivings we might have as to the need for or the wisdom in imposing a near two-life-term sentence to punish a crime that involved staged drug deals, sham drugs, and fake dealers, we turn to the task of assessing whether any of Rivera-Ruperto's legal arguments entitle him to relief. As we have already noted, we address only Rivera-Ruperto's challenges

- 5 -

from his first trial, saving those from the second for discussion in our separate, related opinion.

## DISCUSSION

### I. <u>Lafler</u> Motion

Rivera-Ruperto first challenges the district court's denial of his claim that his first court-appointed attorney provided ineffective assistance at the plea-bargaining stage. We begin by recounting what happened below.

### A.   Background

About a month after Rivera-Ruperto was arraigned, the government made him an initial plea offer of 14 years that covered the charged offenses in all three indictments. Rivera-Ruperto's first court-appointed attorney, Jose Aguayo ("Aguayo"), successfully negotiated that offer down to 12 years. When Rivera-Ruperto refused to take the 12-year deal, Aguayo attempted to negotiate an even lower sentence, but the prosecution told Aguayo that its 12-year offer was final.

Aguayo then showed Rivera-Ruperto the email, which spelled out the government's final offer of 12 years, and explained to him the repercussions of not taking the plea deal. But Rivera-Ruperto rejected the offer still, and directed Aguayo to make a counteroffer of 8 years instead. Unsurprisingly, the government refused the 8-year counteroffer.

In a last-ditch effort, Aguayo joined defense attorneys for five other Operation Guard Shack defendants to attempt to negotiate a global plea deal for the six defendants as a group. The government responded to these overtures by renewing its 12-year offer for Rivera-Ruperto, but this time the offer had an expiration date. When Aguayo showed Rivera-Ruperto the renewed offer, Rivera-Ruperto, once again, rejected it. The offer lapsed on February 4, 2011. Accordingly, on February 7, 2011, the government filed an informative motion, in which it notified the court that plea negotiations had terminated and that a trial schedule needed to be set.

On that same day, Aguayo, apparently alarmed by Rivera-Ruperto's behavior during their meetings regarding the plea negotiations, filed a request for a psychiatric exam for Rivera-Ruperto. In the motion, Aguayo stated that during their meetings, he had witnessed Rivera-Ruperto "exhibiting strange behavior which has progressively worsened," and that Rivera-Ruperto "refuses to, or lacks the ability to appreciate the seriousness of his case, refuses to review the discovery material, appears to lose his lucidity, rants and raves, and vehemently argues with imaginary people in the attorney-client visiting room." The district court granted the motion by electronic order.

Shortly after being examined in early June 2011, Rivera-Ruperto sent Aguayo an email, in which he stated that he wanted to

take the (by then, already expired) 12-year plea offer.  Aguayo responded by advising Rivera-Ruperto that the 12-year deal had timed out, and that they should await the results of the mental evaluation before resuming further plea negotiations.  If he were to withdraw the request for the psychiatric examination before they saw the results, Aguayo explained, Rivera-Ruperto could later argue, even after accepting an offer, that he had not been mentally competent to accept it after all.

When the results of the psychological exam came back in late June, the report deemed Rivera-Ruperto "stable" and contained no diagnoses for mental disorders that would affect Rivera-Ruperto's competency to stand trial.[6]  As promised, Aguayo then reached out to the government to attempt to reopen plea negotiations.  At first, it appeared the government would be unwilling to engage in further plea bargaining with Rivera-Ruperto, whom the government believed had shown himself to be a "malingerer."  But Aguayo was insistent that it was not Rivera-Ruperto who had requested the psychological exam as a delay tactic, but Aguayo himself who had requested it, compelled by his duty to provide Rivera-Ruperto with effective assistance of counsel. After some back and forth, the government relented and agreed to entertain one, and only one more counteroffer from Rivera-Ruperto,

_____

[6] The report also suggested that Rivera-Ruperto may have been exaggerating psychiatric impairment.

- 8 -

but it warned that the counteroffer had to be "substantial" (specifically, somewhere in the ballpark of 20-23 years).

Aguayo met with Rivera-Ruperto to relay this information, making clear that this was their last chance to make a counteroffer, and that a proposal of less than 20 years would not be considered. Despite this advice, Rivera-Ruperto insisted that Aguayo make a counteroffer of only 13 years. Unsurprisingly, the government again rejected this lowball, but nevertheless made one final offer of 18 years. Rivera-Ruperto said no, and then proceeded to fire Aguayo. With plea negotiations over (this time for good), the case was slated for trial.

On March 23, 2012, nine months after the date of the psychological evaluation report and three days before trial was to begin, Rivera-Ruperto, through his second court-appointed attorney, filed a motion alleging that Aguayo had provided ineffective assistance of counsel at the plea-bargaining stage and asking the district court to order the government to reoffer the 12-year deal. The district court granted Rivera-Ruperto's request for an evidentiary hearing on the issue and, after hearing testimony from both Rivera-Ruperto and Aguayo and considering the documentary evidence,[7] the district court concluded there was no

_____

[7] Although the documents themselves are not in the record, the transcript from the Lafler hearing indicates that the parties' submissions included email correspondence between Aguayo and the government regarding plea negotiations, Aguayo's records

- 9 -

merit to the ineffective assistance of counsel claim, and denied Rivera-Ruperto's motion. Rivera-Ruperto says this was error.

## B. Analysis

We review a district court's determination of ineffective assistance of counsel claims de novo and any findings of fact for clear error. Ortiz-Graulau v. United States, 756 F.3d 12, 17 (1st Cir. 2014).

A defendant's Sixth Amendment right to competent counsel extends to the plea-bargaining process. Lafler v. Cooper, 132 S. Ct. 1376, 1380-81 (2012). A defendant claiming, as Rivera-Ruperto does here, that counsel's assistance was ineffective at the plea-bargaining stage, must meet the two-part test laid out in Strickland v. Washington, 466 U.S. 668, 687 (1984). Lafler, 132 S. Ct. at 1384. He must show, first, that counsel's performance was deficient, and second, that "the outcome of the plea process would have been different with competent advice." Id.

Rivera-Ruperto argues that he meets both of these prongs. He contends that he "wanted to accept the 12-year plea offer, and would have sans his original defense counsel's decision to seek an unnecessary psychological evaluation, his related erroneous advice, and his refusal to inform the government and the

_____

containing detailed notes of his visits and conversations with Rivera-Ruperto, and a document signed by Rivera-Ruperto memorializing his refusal to accept the government's original "final" 12-year plea offer.

- 10 -

district Court of [his] decision [to accept the 12-year offer]."[8] But this argument fails on both Strickland requirements. To start, Rivera-Ruperto has failed to establish that Aguayo's performance was defective.

In order to meet the first Strickland prong, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Generally speaking, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Thus, in order to establish deficient performance, a defendant must show that, "given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010) (citing Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006)).

Here, none of Aguayo's actions meets this standard. Aguayo sought a psychological exam only after he observed Rivera-Ruperto arguing with imaginary people and exhibiting other abnormal behavior. While ultimately the results of Rivera-Ruperto's exam may have shown that Rivera-Ruperto did not have any

---

[8] Rivera-Ruperto appears to limit his deficient-performance argument to these bases, and does not challenge the district court's finding that Aguayo otherwise competently made efforts to get lesser plea deals for his client and adequately explained how the plea bargaining process worked.

mental health issues, given the erratic behavior Rivera-Ruperto displayed during their meetings, Aguayo's motion was not "patently unreasonable." Tevlin, 621 F.3d at 66 (citation omitted).[9]

Nor do we think Aguayo's performance was deficient on account of the fact that he advised Rivera-Ruperto to await the results of the psychological exam before pursuing further plea negotiations. First, as we get to in a moment, by the time Rivera-Ruperto had emailed Aguayo to say he wished to take the 12-year plea offer, there was no actual offer for Rivera-Ruperto to take because the last 12-year deal had expired some three or four months prior. But even if there had been a live offer on the table, by the time Rivera-Ruperto expressed any interest in taking a 12-year plea deal, he had already been examined and was awaiting the results. As Aguayo explained to Rivera-Ruperto at the time, it was Aguayo's professional judgment that withdrawing the motion for the psychological exam at that point would threaten the durability of any plea agreement they might have reached because Rivera-Ruperto could later argue that he had not been mentally competent to enter into the deal at all. We think this advice was given in the exercise of reasonable professional judgment, and in any event,

_____

[9] In fact, "where there are substantial indications that the defendant is not competent to stand trial, counsel is not faced with a strategy choice but has a settled obligation . . . under federal law . . . to raise the issue with the trial judge and ordinarily to seek a competency examination." Robidoux v. O'Brien, 643 F.3d 334, 338-39 (1st Cir. 2011).

- 12 -

certainly was not so deficient as to fall below "an objective standard of reasonableness." Strickland, 466 U.S. at 688. Rivera-Ruperto has therefore failed to show that Aguayo's performance was deficient.

Moreover, even if we were to assume the defective performance prong has been met, Rivera-Ruperto's claim still fails because he cannot show the necessary prejudice to meet the second Strickland prong. In order to establish prejudice, a defendant claiming ineffective assistance at the plea bargaining stage must show that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court[,]. . . the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence." Lafler, 132 S. Ct. at 1385. Rivera-Ruperto cannot do so here.

Rivera-Ruperto argues that he would have accepted the 12-year deal but for Aguayo requesting an "unnecessary and unwanted" psychological exam and then refusing to withdraw the request after Rivera-Ruperto told Aguayo that he wished to accept the 12-year offer. But the facts simply do not bear out Rivera-Ruperto's theory that Aguayo's actions are what prevented a 12-year plea deal from being presented to the court. When Rivera-Ruperto emailed to tell Aguayo that he wanted to take the 12-year

plea offer, it was already early June 2011. By that time, nearly four months had passed since the 12-year plea offer had expired. It was therefore not the requested psychological examination that caused Rivera-Ruperto to "lose" a 12-year plea deal, but the fact that he had already rejected the offer (more than once, we might add), leaving no deal on the table for Rivera-Ruperto to accept. Furthermore, even after the results came back from Rivera-Ruperto's psychological exam and the government had labeled him a "malingerer," Rivera-Ruperto had a final opportunity to accept an 18-year plea offer from the government. Rivera-Ruperto rejected even this offer and opted for trial. Rivera-Ruperto has thus failed to show that there is a reasonable probability that any plea deal, much less the 12-year plea deal specifically, would have been presented to the court but for Aguayo's purported ineffective assistance.

Because Rivera-Ruperto has failed to show that Aguayo's performance was defective, and because, even if we were to assume the performance was defective, Rivera-Ruperto has failed to show the requisite prejudice, we affirm the district court's ruling on the Lafler claim.

## II. Jury Instructions

Rivera-Ruperto raises on appeal only one challenge concerning the trial itself. He argues that the district court erred in failing to instruct the jury that it was required to make

- 14 -

its drug quantity findings beyond a reasonable doubt.  We begin once more with a discussion of what happened below.

## A.    Background

After closing arguments were made, the trial judge gave jury instructions, beginning with general instructions, which explained that the prosecution had the burden "to prove guilt beyond a reasonable doubt."  The trial judge then instructed the jury on the elements of the crimes with which Rivera-Ruperto was charged.

As a reminder, among other charges, Rivera-Ruperto was indicted for each of the five drug deals with one count each of two drug crimes: conspiracy and attempted possession with intent to distribute a controlled substance.  As they are the only instructions relevant to our inquiry today, we focus our attention on the judge's instructions regarding drug quantity.

The judge instructed the jury as to the elements of the two drug offenses, and was explicit that in order to find the defendant guilty, the jury had to be convinced that the government had proven each element beyond a reasonable doubt.  The judge did not include drug quantity among these elements, but after explaining the elements of the drug crimes, the judge did tell the jury: "If you find that the defendant conspired or attempted to possess with intent to distribute a controlled substance[,] . . . you will be asked to also make findings as to the quantity of this

substance that the defendant either conspired or attempted to possess."

The trial judge referred to drug quantity one other time in his jury instructions. This was when he described the verdict forms to the jury, explaining: "[I]f you find [the] [d]efendant guilty, then you are also asked to provide the amount of drugs involved in said count. And there's a question for you to find that."[10]

Rivera-Ruperto's trial attorney raised no objections to the jury instructions. After deliberations, the jury returned a verdict in which it found Rivera-Ruperto guilty of all charges. With respect to the drug-related offenses, the jury found Rivera-Ruperto guilty "[i]n the amount of five kilograms or more" for each of the counts, with the exception of the attempted possession count for the September 16 deal, for which the jury did not return a drug quantity finding.[11]

---

[10] The verdict forms (there were two because there were originally two indictments that were consolidated for trial) asked the jury to mark whether it found Rivera-Ruperto "Guilty" or "Not Guilty" for each of the charged counts. Underneath the drug related counts, the verdict form asked the following question:

> If you find the defendant guilty, please answer the following additional question:
>     Do you find that the amount of fake cocaine involved
>     in that offense was (circle one):
>     A. 5 kilograms or more
>     B. At least 500 grams but less than 5 kilograms
>     C. Less than 500 grams

[11] Although the jury found Rivera-Ruperto guilty of that

- 16 -

At sentencing, the district court imposed a sentence for these drug convictions that was based on the jury's drug quantity findings. Specifically, because the jury had found that all of Rivera-Ruperto's drug offenses (except the September 16 attempted possession count) involved 5 kilograms or more of a controlled substance, the court imposed concurrent sentences of 21-years and 10-months' imprisonment for each of these convictions.[12] The sentences thus exceeded the 20-year statutory maximum for offenses involving an indeterminate quantity of drugs, see 21 U.S.C. § 841(b)(1)(C), and instead fell within the minimum 10-year to maximum life sentencing range for offenses involving 5 kilograms or more of a controlled substance, id. § 841(b)(1)(A).

On appeal, Rivera-Ruperto argues that he is entitled to a new trial because the district court failed to instruct the jury that it was required to find the drug quantities beyond a reasonable doubt.

## B.  Analysis

We typically review jury instruction challenges de novo, but where, as here, a defendant failed to object to the jury

---

count, it left the corresponding drug quantity question blank on the verdict form.

[12] For the September 16 attempted possession conviction, for which the jury had returned no drug quantity finding, the district court imposed the maximum statutory sentence of 20 years for offenses involving an indeterminate quantity of drugs. See 21 U.S.C. § 841(b)(1)(C).

instructions below, our review is for plain error.  United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014).

Reversal under the plain error standard requires: (1) that an error occurred; (2) that the error was obvious; (3) that it affected the defendant's substantial rights; and (4) that it threatens the fairness, integrity or public reputation of the proceedings.  Delgado-Marrero, 744 F.3d at 184.  We have noted previously that "[t]his multi-factor analysis makes the road to success under the plain error standard rather steep; hence, reversal constitutes a remedy that is granted sparingly."  United States v. Gelin, 712 F.3d 612, 620 (1st Cir. 2013).

We begin with the question of error.  To satisfy plain error review, we must conclude not only that the district court erred in not instructing the jury that it was required to find drug quantity beyond a reasonable doubt, but that the error was obvious.

The Supreme Court has held that facts such as drug quantity are to be considered elements of the offense and must be found beyond a reasonable doubt if those facts "increase the penalty for a crime beyond the prescribed statutory maximum," Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), or increase the mandatory minimum sentence for a crime, Alleyne v. United States, 133 S. Ct. 2151 (2013).  In this case, it is clear that drug quantity was an element of Rivera-Ruperto's charged drug offenses

because the drug quantity findings increased Rivera-Ruperto's sentence beyond the statutory maximum for undetermined drug quantities. At trial, the judge did submit the drug quantity question to the jury, and also instructed the jury that the government was required to prove each element of the drug offenses beyond a reasonable doubt. But he never instructed the jury that drug quantity was an element of the drug crimes, nor did he ever state explicitly that drug quantity had to be found beyond a reasonable doubt. The question we must answer, then, is whether the jury nonetheless would have understood that it was required to apply the beyond-a-reasonable-doubt standard to its findings on drug quantity. We conclude that it did, and that the court therefore did not commit obvious error.

In United States v. Barbour, 393 F.3d 82, 89 (1st Cir. 2004), a case involving similar facts, the district court failed, much like the court in this case, to instruct the jury that drug quantity was an element of the offense, although it should have done so. We concluded, however, that this failure did not constitute obvious error because the jury had been "clearly instructed that the defendant's guilt must be proven beyond a reasonable doubt" and subsequently told, albeit separately, that, if the jury found the defendant guilty, it would be required to make a drug quantity finding. Id. We reasoned that the instructions, while not perfect, sufficiently "connected that

- 19 -

burden of proof to the drug quantity determination." Id. In addition, as in the present case, the verdict form contained a multiple-choice drug quantity question that immediately followed the question regarding the defendant's guilt. Id. Under those circumstances, we concluded that the district court had not committed plain error. Id.

Likewise, here, although the judge never instructed the jury that it was required to make its drug quantity findings beyond a reasonable doubt (though, we stress, he should have), he correctly submitted the drug quantity question to the jury, instructed the jury more than once as to the government's beyond-a-reasonable-doubt burden, and instructed the jury that if it found Rivera-Ruperto guilty of a drug offense, it would also be required to make a drug quantity finding. Furthermore, on the verdict form, after each question that asked whether the jury found Rivera-Ruperto "guilty" or "not-guilty" of a drug-related offense, a question directing the jury to make a multiple-choice finding as to drug quantity immediately followed. Thus, the "link between the burden of proof and the jury's quantity determination," id. at 89, was at least as close here as it was in Barbour.

In arguing that the district court nonetheless committed plain error, Rivera-Ruperto relies on Delgado-Marrero, a case in which, applying plain error review, we remanded for resentencing on the basis of an Alleyne error. 744 F. 3d at 186-90. In Delgado-

Marrero, however, the district court had submitted drug quantity to the jury as a special verdict question only after the jury had already deliberated and returned its guilty verdict. Id. 186-87. The court never directed the jury to apply the beyond-a-reasonable-doubt standard to the special verdict question, nor did it instruct the jury that drug quantity was an element of the drug offense. Id. at 187. Under those circumstances, "given the timing and manner in which the [drug quantity] question was presented," we reasoned that we could not find that the jury was "sufficiently put on notice of [the drug quantity question's] critical import to this case." Id. Because the jurors "had no cause to understand the special verdict question as involving another element of the offense," we concluded that the court had obviously erred. Id.

By contrast, here, as we have already noted, drug quantity was submitted to the jury in the initial jury instructions and on the verdict form, and the court explicitly instructed the jury that the government was required to prove its case beyond a reasonable doubt. Therefore, Rivera-Ruperto has not cleared the obvious-error hurdle.

Moreover, even if we assumed that the district court's error was obvious and that it affected the defendant's substantial rights,[13] reversal still would not be warranted because Rivera-

---

[13] For all but one of Rivera-Ruperto's convictions, the jury's drug quantity finding triggered enhanced mandatory minimum

Ruperto cannot show that the error was sufficiently fundamental to threaten the fairness, integrity, or public reputation of the proceedings. See id. at 184. The evidence in this case that each of the staged drug deals involved more than 5 kilograms of sham cocaine was "overwhelming" and "essentially uncontroverted," which gives us no basis for concluding that the judicial proceedings were so affected. United States v. Cotton, 535 U.S. 625, 633 (2002) (holding that the fourth plain-error-review requirement cannot be met where the evidence of an element was "overwhelming" and "essentially uncontroverted" at trial) (quoting Johnson v. United States, 520 U.S. 461, 470 (1997)).

At trial, the government showed the jury video footage from each of the charged drug deals of a confidential informant weighing the bricks of sham cocaine, and then Rivera-Ruperto placing each brick into a suitcase. The same confidential informant also testified on the stand as to the number of kilograms of sham cocaine that were used during each deal. No conflicting evidence emerged at trial that might have possibly called into question the government's drug quantity evidence, and Rivera-Ruperto does not provide any argument on appeal as to how we might

---

sentences and resulted in sentences that exceeded the statutory maximum sentence for undetermined drug quantities. Thus Rivera-Ruperto's substantial rights would have been affected had the jury instructions been obviously erroneous, and Rivera-Ruperto would have met plain error review's third prong.

conclude that, given the evidence presented, any error on the district court's part threatened the fairness, integrity, or public reputation of his trial.

Let us be clear: we think the district court's jury instructions were flawed, and that the judge should have instructed the jury that it was required to make its drug quantity findings beyond a reasonable doubt. But, as Rivera-Ruperto has not succeeded in climbing the steep road of plain error review, we cannot reverse.

### III. Sentencing Challenges

Rivera-Ruperto's remaining two arguments are challenges to his sentence. He argues that the government engaged in improper sentencing manipulation when it set up the sting operation, and also that his resulting combined sentence between the two trials of 161 years and 10 months violated the Eighth Amendment's prohibition on cruel and unusual punishment. We begin for a final time by recounting what happened below.

### A.    Background

At the beginning of Rivera-Ruperto's sentencing hearing, defense counsel raised the issue of sentencing manipulation, arguing that the FBI had arbitrarily chosen to use "large" amounts (more than 5 kilograms) of sham cocaine for the sole purpose of enhancing Rivera-Ruperto's sentencing exposure. Defense counsel argued that, for each of the staged drug transactions, the elements

- 23 -

of the charged offenses would have been fulfilled with lesser amounts of sham cocaine, and that the FBI's decision to use the 8-kilogram, 12-kilogram, and 15-kilogram quantities could only have been for purposes of "mere sentencing enhancement."

Defense counsel also argued that the government's charging practices constituted impermissible sentencing manipulation because the series of five drug deals could have been charged as a single drug conspiracy, in which case Rivera-Ruperto would have been convicted of just one count of possession of a firearm in violation of 18 U.S.C. § 924(c), an offense that carries with it a mandatory minimum sentence of 5 years imprisonment, id. § 924(c)(1)(A). Instead, the government chose to charge each drug deal as a separate transaction, counsel contended, fully knowing that each "second or subsequent" conviction under the subsection carries with it a mandatory minimum sentence of 25 years imprisonment, id. § 924(c)(1)(C)(i), which must be served consecutively, id. § 924(c)(1)(D)(ii). As a result, Rivera-Ruperto's sentencing exposure in the first trial was 105-years imprisonment for the firearms convictions alone.

The government argued that there had been no improper conduct on its part. Each staged drug deal had in fact been a separate event, involving varying amounts of sham cocaine. And Rivera-Ruperto had decided each time to participate voluntarily, without regard to the amount involved.

After hearing from both sides, the district court, without making an explicit ruling on the sentencing manipulation argument, imposed the following sentence. For all but one of the drug convictions, the district court sentenced Rivera-Ruperto to concurrent 21-year and 10-month terms of imprisonment.[14] For the remaining attempted possession conviction (for which the jury had not returned a drug quantity finding), the district court sentenced Rivera-Ruperto to a term of 20 years (the statutory maximum where the amount of drugs involved is undetermined). The district court also sentenced Rivera-Ruperto to 5-years imprisonment for his conviction for possession of a firearm with an obliterated serial number during the April 27 drug deal. This 5-year sentence was to run concurrently with the 21-year-and-10-month and 20-year drug sentences.

As for the other firearms counts, the district court imposed a 105-year sentence based on the mandatory 5-year minimum term for the first conviction under 18 U.S.C. § 924(c), and four consecutive 25-year mandatory minimum terms for the four subsequent § 924 convictions. In total, Rivera-Ruperto was

_____

[14] Reminder: the jury convicted Rivera-Ruperto of one count of conspiracy and one count of attempted possession for each of the five drug deals, and found for each count (except for the September 16 attempted possession count) that 5 kilograms or more of sham cocaine were involved.

sentenced to 126-years and 10-months' imprisonment from the first trial.

Rivera-Ruperto was then also convicted of all counts at his second trial, and the second judge imposed a sentence of 35-years imprisonment, to be served consecutively to his first sentence. This brought Rivera-Ruperto's combined sentence for his participation in six fake drug deals to 161-years and 10-months' imprisonment.

Rivera-Ruperto now appeals the sentencing manipulation issue and raises an Eighth Amendment challenge to the total length of his sentence.

B.  **Sentencing Manipulation**

Sentencing factor manipulation occurs "where government agents have improperly enlarged the scope or scale of [a] crime." United States v. Lucena-Rivera, 750 F.3d 43, 55 (1st Cir. 2014) (alteration in original) (quoting United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005)). Where the government engages in such manipulation, we "recognize[] the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy." Fontes, 415 F.3d at 180.

Rivera-Ruperto begins his sentencing manipulation appeal by arguing that the district court neglected to address his properly-raised sentencing manipulation objection at all, and that

this alone constitutes clear error and warrants reversal.  We address this threshold argument first.

It is true that the sentencing hearing transcript reflects that the district court never made an explicit ruling on Rivera-Ruperto's sentencing manipulation objection.  However, the transcript also plainly indicates that at the hearing, the judge invited defense counsel to make any statements he wished.  After defense counsel argued the sentencing manipulation issue, the judge thanked him, acknowledging that he had heard the argument, and then, after allowing Rivera-Ruperto himself to speak, invited the government to respond.  The judge gave the government ample time to argue the sentencing manipulation issue as well, and then thanked the government lawyer before imposing the sentence.

Based on the transcript, we think it evident that the judge effectively denied the sentencing manipulation objection when he chose not to deviate from the statutory minimums in sentencing Rivera-Ruperto for his crimes.  This appears to have been clear enough to defense counsel as well, because counsel raised no objection and asked for no clarification as to the judge's ruling on the sentencing manipulation issue, even when the judge invited counsel to speak after he imposed the sentence.[15]  In

---

[15] The judge asked, "That is the sentence of the Court. Anything else, Counsel?"  Defense counsel responded by requesting abatement for the special monetary assessment (which the judge granted), but did not bring up the sentencing manipulation issue

- 27 -

the face of such an extraordinary sentence, the district court should have taken the time to explain why it concluded that the doctrine of sentencing factor manipulation did not warrant relief, rather than leave it for this court to draw the necessary inferences, but we nevertheless conclude that the judge effectively denied Rivera-Ruperto's sentencing manipulation claim, and we turn to its merits.

Because "[b]y definition, there is an element of manipulation in any sting operation," we reserve relief for sentencing factor manipulation only for "the extreme and unusual case," Lucena-Rivera, 750 F.3d at 55 (alteration in original) (quoting Fontes, 415 F.3d at 180), such as those situations "involving outrageous or intolerable pressure [by the government] or illegitimate motive on the part of the agents," United States v. Navedo-Ramirez, 781 F.3d 563, 580 (1st Cir. 2015) (alteration in original) (quoting United States v. Richardson, 515 F.3d 74, 86 n.8 (1st Cir. 2008)). It is the defendant who bears the burden of establishing sentencing factor manipulation by a preponderance of the evidence, and a district judge's "determination as to whether improper manipulation exists is ordinarily a factbound determination subject to clear-error review." United States v. Gibbens, 25 F.3d 28, 30 (1st Cir. 1994).

---

again.

Here, Rivera-Ruperto argues, as he did below, that the government engaged in sentencing manipulation by using unnecessarily high quantities of sham drugs during the deals, by requiring Rivera-Ruperto to bring a firearm with him to each of the deals, and then by allowing him to participate in a "seemingly endless" number of those deals.[16] The government's only reason for structuring the sting operation in this way, he says, was to inflate his eventual sentence.

But Rivera-Ruperto has not met his burden to show by a preponderance of the evidence that the government's motivations were indeed improper. At trial, FBI agents testified that the government used large quantities of sham cocaine for the purpose of ensuring that the staged deals looked realistic enough to warrant the need for armed security. Although it is certainly feasible that, as Rivera-Ruperto argues, the agents could have used some lesser quantity of drugs and still made the deals look

---

[16] In his brief, Rivera-Ruperto appears not to reprise the argument, which he raised below, that the prosecution's charging practices (specifically, its decision to charge the five drug deals separately as opposed to as a single conspiracy) constituted impermissible sentencing manipulation. To the extent that counsel alluded to this issue at oral argument, absent exceptional circumstances, we generally consider as waived issues raised only at oral argument. See United States v. Vazquez-Rivera, 407 F.3d 476, 487-88 (1st Cir. 2005). And even if we were to make an exception here, counsel has provided no evidence that the government was driven by improper motives in charging the drug transactions, which occurred on separate days and involved distinct drug deals, as separate conspiracies.

realistic, the mere fact that they did not, without more, does not establish that the agents engaged in the kind of "extraordinary misconduct," United States v. Sánchez-Berríos, 424 F.3d 65, 78-79 (1st Cir. 2005), that is required of a successful sentencing manipulation claim.

Likewise, it was a part of the sting operation's design from the get-go that Operation Guard Shack would "hire" corrupt law enforcement officers to provide armed security at the staged drug deals, and that those officers would then, in turn, be asked to recruit others to participate in subsequent deals, thereby unwittingly assisting the sting in ferreting out additional corrupt officers.[17]  Rivera-Ruperto has provided no evidence to suggest that, in telling him to bring a firearm to the deals or in allowing him to participate in multiple deals, the FBI agents engaged in "anything beyond the level of manipulation inherent in virtually any sting operation" or "lure[d] the appellant[] into committing crimes more heinous than [he was] predisposed to commit." Sánchez-Berríos, 424 F.3d at 79.

Moreover, these same arguments have already been attempted and lost by other Operation Guard Shack defendants.  See

_____

[17] As we have already noted, Rivera-Ruperto was not himself a police officer (and turned out not even to be a prison corrections officer, as he had originally claimed), but among those co-defendants that he recruited to participate in subsequent Operation Guard Shack deals, at least one was an officer in the Puerto Rico Police Department.

<u>Navedo-Ramirez</u>, 781 F.3d at 570 (denying defendant's argument that government's use of high drug quantities constituted sentencing factor manipulation); <u>Lucena-Rivera</u>, 750 F.3d at 55 (rejecting the defendant's argument that the government had prolonged its investigation for a year in order to inflate the sentence, where the government argued that it had done so to identify other conspirators, and the defendant did not otherwise present sufficient evidence of an improper motive); <u>Sánchez-Berríos</u>, 424 F.3d at 78-79 (denying defendant's argument that the government connived to make him bring his firearm to the deal in order to enhance his sentencing exposure). The district court therefore did not clearly err in denying Rivera-Ruperto's sentencing manipulation claim.

## C.  Eighth Amendment

Rivera-Ruperto's final argument on appeal is an Eighth Amendment challenge to his sentence. Rivera-Ruperto argues that his combined sentence between the two trials for 161-years and 10-months' imprisonment constitutes cruel and unusual punishment. We assume, favorably to Rivera-Ruperto, that this Eighth Amendment argument was properly preserved, and review his challenge <u>de novo</u>.[18]

---

[18] The government makes no argument whatsoever in its brief in this first appeal as to what standard of review applies, but it argues in its brief in Rivera-Ruperto's second appeal that Rivera-Ruperto's Eighth Amendment claim was not properly preserved below,

Let us begin by acknowledging that Rivera-Ruperto's 161-year and 10-month sentence is indeed extraordinarily long. But in order to deem it constitutionally infirm under the Eighth Amendment's cruel and unusual punishment clause, there are three criteria we must assess: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." United States v. Polk, 546 F.3d 74, 76 (1st Cir. 2008) (quoting Solem v. Helm, 463 U.S. 277, 292 (1983)). We reach the last two criteria only if we can first establish that the sentence, on its face, is grossly disproportionate to the crime. Id.

To quickly sketch out the underpinnings for Rivera-Ruperto's sentence once more, of the combined 161 years and 10 months to which Rivera-Ruperto was sentenced, the lion's share of

and that plain error review applies. For his part, Rivera-Ruperto does not discuss the standard of review in either opening or reply brief in either appeal.

On our read of the record, at least when it comes to his first sentence, Rivera-Ruperto probably did enough to preserve an Eighth Amendment challenge. At the first sentencing hearing after the first trial, counsel for Rivera-Ruperto argued that the prescribed statutory minimums had resulted in a punishment that "goes way over, substantially way over, what's necessary for punishing these offenses," and resulted in a "horribly, horribly increased sentence which borderlines on draconian." No similar arguments were made at Rivera-Ruperto's second sentencing, but for our purposes today, we will apply the defendant-friendly de novo standard to Rivera-Ruperto's challenge to his combined sentence.

the sentence -- 130 years to be exact -- was the result of minimum sentences required by statute for Rivera-Ruperto's six firearms convictions under 18 U.S.C. § 924(c)(1)(C) (5 years for his first § 924 conviction, and 25-year consecutive sentences for each of the five subsequent convictions).[19]  Because Rivera-Ruperto bases his Eighth Amendment challenge on the length of his sentence in its totality, in order to prevail, he must establish that this statutorily-mandated 130-year sentence is grossly disproportionate on its face.[20]  Thus, we focus our inquiry here on the portion of his sentence stemming from the § 924(c) convictions.

In noncapital cases, the Eighth Amendment "does not require a precise calibration of crime and punishment."  United States v. Graciani, 61 F.3d 70, 76 (1st Cir. 1995).  Rather, "[a]t most, the Eighth Amendment gives rise to a 'narrow proportionality principle,' forbidding only extreme sentences that are significantly disproportionate to the underlying crime."  Id. (quoting Harmelin v. Michigan, 501 U.S. 957, 997 (1991) (Kennedy, J.)).  We have previously remarked that "instances of gross

---

[19] As for the rest of Rivera-Ruperto's term of imprisonment, as we have already explained, 21 years and 10 months of the sentence were the result of all the remaining convictions from the first trial, and 10 years of the sentence were from the remaining convictions from the second trial.

[20] In other words, Rivera-Ruperto does not argue that we could somehow find that the remaining 31 years and 10 months resulting from his other convictions were, by themselves, grossly disproportionate to the crimes for which they were imposed.

disproportionality will be hen's-teeth rare." Polk, 546 F.3d at 76. The Supreme Court has upheld against disproportionality challenges, for example, a sentence of 25 years to life under California's "three strikes law" for the theft of golf clubs, Ewing v. California, 538 U.S. 11, 30-31 (2003), and a sentence of 40 years for possession with intent to distribute nine ounces of marijuana, Hutto v. Davis, 454 U.S. 370, 370-74 (1982) (per curiam).

The dissent here argues that in those cases where the Supreme Court has upheld harsh sentences for seemingly minor crimes, the Court's rationale was justified because the offenders were recidivists and recidivism is a legitimate basis on which a legislature can elect to sentence more harshly. However, we see no reason why recidivism may be deemed such a legitimate basis, but crimes involving the combination of drugs and weapons -- like those targeted by the § 924(c) stacking regime -- may not also be deemed a legitimate basis. To the contrary, "[t]he Supreme Court has noted that the 'basic purpose' of § 924(c) is 'to combat the dangerous combination of drugs and guns'" and "has also noted that 'the provision's chief legislative sponsor . . . said that the provision seeks to persuade the man who is tempted to commit a Federal felony to leave his gun at home.'" United States v. Angelos, 433 F.3d 738, 751 (10th Cir. 2006) (quoting Muscarello v. United States, 524 U.S. 125, 126 (1998)).

- 34 -

Defendants have a particularly difficult time passing through the proportionality principle's narrow channel where the sentence is the result of a statutory mandate.  This is because courts are required to give deference to the judgments of the legislature in determining appropriate punishments, and must "step softly and cede a wide berth to the Legislative Branch's authority to match the type of punishment with the type of crime."  Polk, 546 F.3d at 76; see also Harmelin, 501 U.S. at 998 ("[T]he fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter is 'properly within the province of legislatures, not courts.'" (quoting Rummel v. Estelle, 445 U.S. 263, 275-76 (1980)).  Accordingly, "[n]o circuit has held that consecutive sentences under § 924(c) violate the Eighth Amendment."  United States v. Robinson, 617 F.3d 984, 991 (8th Cir. 2010) (alteration in original) (quoting United State v. Wiest, 596, F.3d 906, 912 (8th Cir. 2010)).  For example, courts have upheld against Eighth Amendment challenges such sentences as a 107-year and 1-month sentence for a defendant's five § 924(c) convictions, United States v. McDonel, 362 F. App'x 523, 530 (6th Cir.), cert. denied, 562 U.S. 1061 (2010); a 132-year and 1-day sentence, of which 125 years were for § 924(c) convictions, United States v. Ezell, 265 F. App'x 70, 72 (3d. Cir. 2008); a 147-year and 8-month sentence based, in large part, on a defendant's six § 924(c) convictions, United States v. Watkins, 509 F.3d 277, 282

(6th Cir. 2007); and a 155-year sentence for seven § 924(c) convictions, United States v. Hungerford, 465 F.3d 1113, 1117-18 (9th Cir. 2006), cert. denied, 550 U.S. 938 (2007). Rivera-Ruperto has not presented any contrary authority upon which we might base a departure from our sister circuits' holdings here.

At oral argument, counsel for Rivera-Ruperto argued that we should be swayed by the fact that, in this case, the crime involved fake drug deals. A near two life-term punishment where no real drugs and no real drug dealers were involved, he contended, is a punishment that is grossly disproportionate on its face. But in coming to this sentence, the judge below was guided by and correctly employed a sentencing scheme that is written into statute -- a statute that makes no distinction between cases involving real versus sham cocaine. At each of the six stings, in fact, Rivera-Ruperto repeatedly and voluntarily showed up armed and provided security services for what he believed to be illegal transactions between real cocaine dealers. The crime of possessing a firearm in furtherance of such a drug trafficking offense is a grave one, and Congress has made a legislative determination that it requires harsh punishment. Given the weight of the case law, we see no Eighth Amendment route for second-guessing that legislative judgment.

We thus cannot conclude that Rivera-Ruperto has established that his sentence, which is largely due to his

- 36 -

consecutive sentences under § 924(c), is grossly disproportionate

to the crime, so as to trigger Eighth Amendment protections.[21]

---

[21] Because Rivera-Ruperto fails to establish that his sentence is grossly disproportionate, we need not reach the last two criteria -- a comparison of his sentence with sentences received by other offenders in the same jurisdiction or a comparison of his sentence with sentences imposed for the same crime in other jurisdictions. Nevertheless, we note that in comparing Rivera-Ruperto's sentence, the dissent relies largely on the rationale of Judge Cassell in United States v. Angelos, 345 F. Supp. 2d 1227 (D. Utah 2004), aff'd, 433 F.3d 738 (10th Cir. 2006). However, despite Judge Cassell's misgivings about the resulting sentence under § 924(c) for a 24 year old first-time offender in that case, he ultimately (and we think correctly) ruled that:

> The court's role in evaluating § 924(c) is quite limited. The court can set aside the statute only if it is irrational punishment without any conceivable justification or is so excessive as to constitute cruel and unusual punishment in violation of the Eighth Amendment. After careful deliberation, the court reluctantly concludes that it has no choice but to impose the 55 year sentence. While the sentence appears to be cruel, unjust, and irrational, in our system of separated powers Congress makes the final decisions as to appropriate criminal penalties. Under the controlling case law, the court must find either that a statute has no conceivable justification or is so grossly disproportionate to the crime that no reasonable argument can be made [on] its behalf. If the court is to fairly apply these precedents in this case, it must reject [the defendant's] constitutional challenges.

Angelos, 345 F. Supp. 2d at 1230.

Similarly, we cannot find that the sentence imposed pursuant to § 924(c) has no conceivable justification or is so grossly disproportionate that no reasonable argument can be made on its behalf. However unfair we may deem the life sentence here, we cannot say that the Constitution forbids it.

- 37 -

## CONCLUSION

Our job now finished, we affirm for the reasons we have stated above.  A second opinion, in which we address Rivera-Ruperto's separate challenges as to his second trial, issues herewith.

**-Dissenting Opinions Follows-**

**TORRUELLA**, <u>Circuit Judge</u> **(Dissenting).**  The majority today affirms a sentence of 160 years and one month without the possibility of parole for Rivera-Ruperto.  The transgression for which Rivera-Ruperto was punished in such an extreme manner was his participation as a security guard in several fake transactions, while the FBI duped Rivera-Ruperto into believing that the composite was actually illegal drugs.  The FBI ensured that more than five kilograms of composite moved from one agent's hands to another at each transaction; the FBI also made sure that the rigged script included Rivera-Ruperto's possession of a pistol at each transaction.  This combination -- more than five kilograms of composite, a pistol, and separate transactions -- triggered the mandatory consecutive minimums of 18 U.S.C. § 924(c), which make up 130 years of Rivera-Ruperto's sentence.

In a real drug transaction, all participants would be guilty of a crime.  And, in general, the greater their knowledge of the crime would be, the harsher the law would punish them.  In the fictitious transaction we are faced with today, however, only the duped participants, who had no knowledge of what truly transpired, are punished.  The other participants are not only excused, but indeed rewarded for a job well done.

If Rivera-Ruperto had instead knowingly committed several real rapes, second-degree murders, and/or kidnappings, he would have received a much lower sentence; even if Rivera-Ruperto

had taken a much more active role in, and brought a gun to, two much larger real drug deals, he would still have received a much lower sentence.[22]  For these and many other crimes Rivera-Ruperto would have received sentences that would see him released from prison during the natural term of his life.  For the fictitious transgressions concocted by the authorities, however, Rivera-Ruperto will spend his entire life behind bars -- a sentence given to first-degree murderers, 18 U.S.C. § 1111, or those who cause death by wrecking a train carrying high-level nuclear waste.  18 U.S.C. § 1992.

From the majority's approval of the draconian sentence imposed in this case,  I respectfully dissent.  Rivera-Ruperto's sentence is grossly disproportionate to his offense, and therefore violates the Eighth Amendment to the Constitution.  While some seemingly excessively harsh sentences have withstood Eighth Amendment challenges, such harsh sentences have been sanctioned only in the context of recidivists or those who otherwise dedicated

_____

[22]   See, e.g., United States v. Carlos Cruz, 352 F.3d 499, 509-10 (1st Cir. 2003) (affirming a sentence of 32 years given to an actual drug dealer -- who was caught with actual cocaine, heroin, cocaine base, two machine guns, a rifle, a pistol, and a large amount of ammunition -- on seven counts related to possession with intent to distribute illegal drugs and to possession of firearms); United States v. Grace, case no. 1-16-cr-0039-001 (D. Maine Dec. 13, 2016) (sentence of 15 years for conspiracy to distribute and possess 100 or more grams of heroin.  Defendant had two prior convictions and admitted to importing more than 20,000 bags of cocaine).

themselves to a life of crime -- a context that explained the severity of the sentences.  But Rivera-Ruperto has no criminal record, nor has he dedicated himself to a life of crime.  Not even under the infamous § 924(c) has a first-time offender like Rivera-Ruperto ever been condemned to spend his entire life in jail.[23]

## I.  **The Eighth Amendment**

> The Court's cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty.
>
> In the first classification the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive.

Graham v. Florida, 560 U.S. 48, 59 (2010).

The second classification has evolved to encompass not only the death penalty, but also prison sentences.  See id. at 61-62, 82 (holding that a sentence of life without the possibility of parole for non-homicide offenses by juveniles violates the Eighth

---

[23]  See infra Section II.A.  Although § 924(c) has rightly been the subject of much scathing criticism, the statute as such is not the focus of this dissent.  See, e.g., Judge Paul Cassell, Statement on Behalf of the Judicial Conference of United States from U.S. District Judge Paul Cassell before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security, 2007 WL 3133929, Fed. Sent'g Rep. 19(5) (2007).  Rather, what is at issue today is the proportionality of Rivera-Ruperto's sentence, not the proportionality of sentences under § 924(c) in general.

Amendment); Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012) (holding that a mandatory sentence of life without parole for juvenile offenders violates the Eighth Amendment).

In the present case, this court is faced with a challenge that falls under the first classification: a challenge to the length of Rivera-Ruperto's sentence based on the circumstances of his case; in other words, an as-applied constitutional challenge to the length of Rivera-Ruperto's sentence.

The Supreme Court's jurisprudence in this first classification is animated by the principle of proportionality in punishment, as well as by deference to the legislature's judgment as to what punishment is merited.

## A. Proportionality

The principle of proportionality is deeply embedded into the very roots of our legal system. Solem v. Helm, 463 U.S. 277, 284 (1983). "In 1215 three chapters of Magna Carta were devoted to the rule that 'amercements' [the most common criminal sanction at the time] may not be excessive" -- and disproportionate penalties were invalidated accordingly by the royal courts. Id. at 284-85. When the Framers adopted the language of the Eighth Amendment from the English Bill of Rights -- which provided that "excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted" -- they also adopted the principle of proportionality, for it was a major

theme of the era that Americans had all the rights of English subjects.  Id. at 285-86.

The principle of proportionality is not merely of historical interest, however.  In that same case, the Court went on to observe that "[t]he constitutional principle of proportionality has been recognized explicitly in this Court for almost a century."  Id. at 286.  The Court proceeded to cite from no fewer than eleven of its precedents ranging from 1892 to 1982, in which the principle of proportionality was recognized[24] -- and

_____

[24]   To wit:  O'Neil v. Vermont, 144 U.S. 323, 339-40 (1892) (Field, J., dissenting) (the Eighth Amendment "is directed ... against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged"); Trop v. Dulles, 356 U.S. 86, 100 (1958) (plurality opinion); id. at 111 (Brennan, J., concurring); id. at 125-26 (Frankfurter, J., dissenting).  Weems v. United States, 217 U.S. 349, 367, 372-73 (1910) ("that it is a precept of justice that punishment for crime should be graduated and proportioned to offense," and endorsing the principle of proportionality as a constitutional standard); Robinson v. California, 370 U.S. 660, 667 (1962) ("But the question [of excessive punishment under the Eighth Amendment] cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."); Enmund v. Florida, 458 U.S. 782 (1982) (death penalty excessive for felony murder when defendant did not take life, attempt to take life, or intend that a life be taken or that lethal force be used); Coker v. Georgia, 433 U.S. 584, 592 (1977) (plurality opinion) ("sentence of death is grossly disproportionate and excessive punishment for the crime of rape"); id., at 601, (Powell, J., concurring in the judgment in part and dissenting in part) ("ordinarily death is disproportionate punishment for the crime of raping an adult woman"); Hutto v. Finney, 437 U.S. 678, 685 (1978); Ingraham v. Wright, 430 U.S. 651, 667 (1977); Gregg v. Georgia, 428 U.S. 153, 171-72 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); Hutto v. Davis, 454 U.S. 370, 374, and n.3 (1982) (per curiam) (recognizing that some prison sentences may be constitutionally disproportionate); Rummel v. Estelle, 445 U.S.

this was not even an exhaustive list.  See id. at 287-88, n.11, 12.  The Court proceeded to hold that a punishment of life without the possibility of parole was disproportionate to the offense of issuing a no account check in the amount of $100 (even though it was the defendant's seventh offense) -- and that this sentence therefore violated the Eighth Amendment.  Id. at 303.

The Supreme Court has continued to recognize that prison sentences must be proportional under the Eighth Amendment in every case that has dealt with that question since Solem.[25]  See Harmelin v. Michigan, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring)[26] ("[t]he Eighth Amendment proportionality principle also applies to noncapital sentences"); Ewing v. California, 538 U.S. 11, 20 (2003) ("The Eighth Amendment . . . contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'") (internal citations omitted); id. at 33 (Stevens, Souter, Ginsburg, Breyer, JJ., dissenting) ("The concurrences prompt this separate writing to emphasize that proportionality review is not only capable of

---

263, 272, n.11 (1980) ("[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare").

[25] I here limit my consideration to non-capital cases, because capital cases fall within the second classification of Eighth Amendment proportionality challenges. Note, however, that in capital cases, the principle of proportionality certainly applies as well.  See, e.g., Graham, 560 U.S. at 59-61.

[26] This concurrence has since been described as "controlling."  Graham, 560 U.S. at 59.

- 44 -

judicial application but also required by the Eighth Amendment.");
Lockyer v. Andrade, 538 U.S. 63, 72 (2003) ("Through this thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as 'clearly established' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years."); Graham, 560 U.S. at 59 ("The concept of proportionality is central to the Eighth Amendment."); Miller, 132 S. Ct. at 2463 (same).[27]

## B.  Deference to the Legislature

The same case law is also clear that respect for the judgment of the legislature as to what constitutes appropriate punishment is in order.  See, e.g., Solem, 463 U.S. at 290 ("[w]e hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes"); Ewing, 538 U.S. at 24 (noting that "[t]hough three strikes laws may be relatively new, our tradition of deferring to state legislatures in making and implementing such important

---

[27]  Although the position that the Eighth Amendment does not contain a proportionality principle was occasionally raised, it never achieved a majority in the Supreme Court, and has been squarely rejected.  See, e.g., Miller, 132 S. Ct. at 2483 ("The [Eighth Amendment] does not contain a proportionality principle.") (Thomas, Scalia, JJ., dissenting) (internal citation omitted).

policy decisions is longstanding", and adding "[o]ur traditional deference to legislative policy choices finds a corollary in the principle that the Constitution 'does not mandate adoption of any one penological theory'").  The proportionality principle is therefore sometimes described as "narrow," and only in "exceedingly rare" instances of "gross disproportionality" should the courts apply the Eighth Amendment to overturn a sentence. See, e.g., id. at 20, 21.

**C.  The Three-Step Analysis**

Thus it is clear that proportionality is of crucial importance in our sentencing law, but its "precise contours . . . are unclear". Lockyer, 538 U.S. at 72, 73.  It is also clear that these contours are primarily determined by deference to the legislature's judgment as to appropriate punishment.  This has led to the emergence of a three-step analysis that assesses both proportionality and the legislature's judgment.  In performing this three-part test, courts must look at the actual severity of a defendant's offenses (as opposed to merely looking at the laws he violated), as well as look at the actual severity of the penalty (rather than merely at the name of the penalty); and courts must give recidivism great weight when assessing the gravity of an offense, and thus when justifying a harsh sentence.

### 1. The Three Steps

> The controlling opinion in Harmelin explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual.

Graham, 560 U.S. at 60 (internal citations omitted; alterations in original).

### 2. Actual Severity of the Offense and of the Punishment

In performing the three-step analysis, the Supreme Court has considered the actual severity of the acts committed by defendants, as well as the importance of the laws they violated. See, e.g., Ewing, 538 U.S. at 18-19, 28 (detailing defendant's past nine criminal convictions and considering the dollar value of the merchandise stolen by the defendant in his latest conviction).

Similarly, the Supreme Court has been clear that for the purposes of the three-step analysis, courts must look to the actual severity of the penalty -- that is, the actual amount of time a defendant will serve in prison -- and not to what his penalty is called.

> [The defendant's] present sentence is life
> imprisonment without possibility of parole. . . .
> Helm will spend the rest of his life in the state
> penitentiary.  This sentence is far more severe than
> the life sentence we considered in Rummel v. Estelle.
> Rummel was likely to have been eligible for parole
> within 12 years of his initial confinement, a fact on
> which the Court relied heavily.

Solem, 463 U.S. at 297.[28]

The Supreme Court reaffirmed this approach in 2012, its most recent pronouncement on the issue:

> The two 14-year-old offenders in these cases were
> convicted of murder and sentenced to life imprisonment
> without the possibility of parole. . . .  State law
> mandated that each juvenile die in prison even if a
> judge or jury would have thought that his youth and
> its attendant characteristics, along with the nature
> of his crime, made a lesser sentence (for example,
> life with the possibility of parole) more appropriate.

Miller, 132 S. Ct. at 2460 (original emphasis).

### 3. Recidivism

The Supreme Court has upheld several harsh sentences for seemingly relatively minor crimes.  The Supreme Court reasoned that the severity of these sentences was justified because they involved recidivist offenders and recidivism was a legitimate

---

[28]  The Court explicitly rejected the Government's argument that the possibility of executive clemency made a sentence of life without the possibility of parole the same as a sentence of life with the possibility of parole.  Id. at 303 ("The possibility of commutation is nothing more than a hope for 'an ad hoc exercise of clemency.' It is little different from the possibility of executive clemency that exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless.").

basis on which a legislature could elect to sentence more harshly. For instance, in <u>Rummel</u> v. <u>Estelle</u>, the Supreme Court upheld a sentence of life with the possibility of parole for obtaining $120.75 under false pretenses, but reasoned that:

> Moreover, given Rummel's record, Texas was not required to treat him in the same manner as it might treat him were this his first "petty property offense." Having twice imprisoned him for felonies, Texas was entitled to place upon Rummel the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.
>
> The purpose of a recidivist statute such as that involved here is not to simplify the task of prosecutors, judges, or juries. Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes.

<u>Rummel</u>, 445 U.S. at 284.

In <u>Ewing</u>, to use another example, the Supreme Court devoted an entire section of its opinion to explaining that the defendant's sentence of 25 years to life for stealing three golf clubs under California's three strikes law must be understood in the context of recidivism, and explained: "California's justification is no pretext. Recidivism is a serious public safety concern in California and throughout the Nation." <u>Ewing</u>, 538 U.S. at 26. "In weighing the gravity of Ewing's offense, we must place

on the scales not only his current felony, but also his long history of felony recidivism." Id. at 29.

Indeed, of the seven cases that address as-applied proportionality challenges under the Eighth Amendment, five deal with recidivist offenders.[29] Of the remaining two cases, one (Harmelin) deals with a career criminal (another important justification for meting out sentences that appear harsh on their face); and in the final case (Weems) the punishment was held to violate the Eighth Amendment.

## II. Discussion

### A. Three-Step Test

Rivera-Ruperto's case has no difficulty clearing the first step of the three-step analysis, in which "[a] court must begin by comparing the gravity of the offense and the severity of the sentence. '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then [proceed to the second step of the analysis]." Graham, 560 U.S. at 59 (internal citations omitted). In over forty years on the federal bench, I have never seen so disproportionate a penalty handed down, particularly where the offense is based on fiction. I am certainly not alone in finding this sentence to be vastly disproportionate to the offense.

---

[29] To wit, Rummel, Hutto, Solem, Ewing, Lockyer.

Speaking on behalf of the Judicial Conference of the United States, Judge Paul Cassell, after describing mandatory minimum sentences -- in particular under § 924(c) -- as "one-size-fits-all injustice," "bizarre," "irrational," "cruel and unusual, unwise and unjust," concluded that the mandatory minimum system of sentencing "must be abandoned in favor of a system based on principles of fairness and proportionality."[30] The Sentencing Commission, too, views sentences such as Rivera-Ruperto's as disproportionate -- not only would its Guidelines recommend a far lower sentence, but the Commission stated that sentences as a result of § 924(c) stacking "can lead to sentences that are excessively severe and disproportionate to the offense committed."[31] As an example, the Commission cited the case of Weldon Angelos, a marijuana dealer who received a sentence of 61.5 years (55 years of which was mandatory minimum sentence under

---

[30] Judge Paul Cassell, Statement on Behalf of the Judicial Conference of United States from U.S. District Judge Paul Cassell before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security, 2007 WL 3133929, Fed. Sent'g Rep. 19(5) (2007) (quoting Senior Judge Vincent L. Broderick, Southern District of New York, speaking for the Criminal Law CommRRep. 19(5) (2007) (quoting Senior Judge Vincent L. Broderick, Southern District of New York, speaking for the Criminal Law Committee of the Judicial Conference in testimony before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, July 28, 1993).

[31] United States Sentencing Commission, 2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 359 (2011).

§ 924(c) for bringing (but not using or brandishing) a gun to three marijuana deals)[32] -- Rivera-Ruperto, however, is faced with a sentence of 160 years (130 years due to stacking under § 924(c)).

Rivera-Ruperto's case also has no trouble passing the second step, namely a comparison of "the defendant's sentence with the sentences received by other offenders in the same jurisdiction." Graham, 560 U.S. at 60. "If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." Solem, 463 U.S. at 291. Rivera-Ruperto received, effectively, a mandatory sentence of life without the possibility of parole ("LWOP") -- because 160 years is about two human lifetimes. The district court has effectively condemned him to die in prison. As noted above, this court is to consider the actual time a defendant is to spend incarcerated -- in Rivera-Ruperto's case, that means his whole life. See supra Section I.C.2. If, however, one compares his offense to other offenses that would result in mandatory LWOP under federal law, then his offense pales in comparison. I have been able to locate forty-nine statutes that prescribe a mandatory penalty of LWOP.[33]

---

[32] Id. n.903.

[33] See United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System, App. A (2011).

Seventeen of these are for first degree murder.[34] The general statute imposing a mandatory minimum for first degree murder, 18 U.S.C. § 1111, goes back to 1790. Congress has steadily widened its application since then, and it now covers many specific situations, from killing the president, 18 U.S.C. § 1751(a), to killing an eggs product quality inspector, 21 U.S.C. § 1041(b). Other statutes mandate a sentence of LWOP for such crimes as genocide killing -- perhaps the gravest crime imaginable -- 18 U.S.C. § 1091, wrecking a train carrying high level nuclear material and thereby causing death, 18 U.S.C. § 1992, and hostage taking resulting in death, 18 U.S.C. § 1203. Rivera-Ruperto's offenses simply do not rise to the level of the offenses in this chart. The complete chart follows.

| | Statute (Guideline) | Description | Date Enacted[35] | Minimum Term[36] |
|---|---|---|---|---|
| 1 | 15 U.S.C. § 1825(a)(2)(c) (§2A1.1) | First degree murder of horse official | 1970 | Life** |

---

[34] Note that the statutes permit the death penalty for first degree murder. 18 U.S.C. § 1111. Because the statutes only mandate a sentence of LWOP and the death penalty is given only rarely, I include the statutes in the comparison. After all, the statutes reflect Congress's judgment that first degree murder, without more -- already a heinous offense far worse that Rivera-Ruperto's -- is adequately punished by LWOP.

[35] I follow the Sentencing Commission here by indicating the year during which the mandatory minimum was first enacted with respect to the substantive offense proscribed by the relevant statute. See supra n.11, Mandatory Minimum Penalties in the Federal Criminal Justice System.

[36] All sentences are without the possibility of parole, for parole has been abolished in the federal system. See Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections

| | Statute (Guideline) | Description | Date Enacted[35] | Minimum Term[36] |
|---|---|---|---|---|
| 2 | 18 U.S.C. § 115 (§§2A1.1, 2A1.2, 2A2.1, 2X1.1) | First degree murder of federal official's family member | 1984 | Life** |
| 3 | 18 U.S.C. § 175c(c)(3) (§2M6.1) | If the death of another results from a person's violation of subsection (a) (knowingly produce, engineer, synthesize, acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess and threaten to use, variola virus) | 2004 | Life |
| 4 | 18 U.S.C. § 229a | Develop/produce/acquires/transfer/possess/use any chemical weapon that results in the death of another person. | 1998 | Life** |
| 5 | 18 U.S.C. § 351 (§§2A1.1, 2A1.2, 2A1.3, 2A1.4) | First degree murder of Congress, Cabinet, or Supreme Court member | 1971 | Life** |
| 6 | 18 U.S.C. § 924(c)(1)(C)(ii)(§2K2.4) | Second or subsequent conviction of using or carrying a firearm during a crime of violence or drug trafficking crime and firearm is a machine gun or destructive device or the firearm is equipped with a silencer or muffler | 1986 | Life |
| 7 | 18 U.S.C. § 930(c) (§2K2.5) | First degree murder involving the possession or use of a firearm or other dangerous weapon in a Federal Facility | 1988 | Life** |
| 8 | 18 U.S.C. § 1091 (§2H1.3) | Genocide killing | 1988 | Life** |
| 9 | 18 U.S.C. § 1111 (§§2A1.1, 2A1.2) | First degree murder | 1790 | Life** |
| 10 | 18 U.S.C. § 1114 (§§2A1.1, 2A1.2, 2A1.3, 2A1.4, 2A1.2) | First degree murder of federal officers | 1934 | Life** |
| 11 | 18 U.S.C. § 1116 (§§2A1.1, 2A1.2, 2A1.3, 2A1.4, 2A2.1) | First degree murder of foreign officials, official guests, or internationally protected persons | 1972 | Life** |
| 12 | 18 U.S.C. § 1118 (§§2A1.1, 2A1.2) | Murder in a federal correctional facility by inmate sentenced to a term of life imprisonment | 1994 | Life** |
| 13 | 18 U.S.C. § 1119(b) (§§2A1.1, 2A1.2, 2A1.3, 2A1.4, 2A2.1) | First degree murder of a U.S. national by a U.S. national | 1994 | Life** |

of 18 U.S.C. and 28 U.S.C.).

| | Statute (Guideline) | Description | Date Enacted[35] | Minimum Term[36] |
|---|---|---|---|---|
| | | while outside the United States | | |
| 14 | 18 U.S.C. § 1120 (§§2A1.1, 2A1.2, 2A1.3, 2A1.4) | Murder by escaped federal prisoner | 1996 | Life** |
| 15 | 18 U.S.C. § 1121(a)(1) (§§2A1.1, 2A1.2) | First degree murder of a state or local law enforcement officer or any person assisting in a federal crime investigation | 1996 | Life** |
| 16 | 18 U.S.C. § 1201(a) | Kidnapping | 2003 | Life** |
| 17 | 18 U.S.C. § 1203 (§§2A4.1, 2X1.1) | Hostage taking resulting in the death of any person | 2003 | Life** |
| 18 | 18 U.S.C. § 1503(b)(1) (§2J1.2) | First degree murder of an officer of the court or juror | 1948 | Life** |
| 19 | 18 U.S.C. § 1512(a)(1) (§§2A1.1, 2A1.2, 2A1.3, 2A2.1) | First degree murder of any person with the intent to prevent their attendance or testimony in an official proceeding | 1982 | Life** |
| 20 | 18 U.S.C. § 1512(a)(2) (§§ 2A1.1, 2A1.2, 2A1.3, 2A2.1) | Obstructing justice by using, or attempting to use, physical force against another | 1982 | Life |
| 21 | 18 U.S.C. § 1512(a)(3)(A) (§§2A1.1, 2A1.2, 2A1.3, 2A2.1) | Obstructing justice by tampering with a witness, victim, or an informant | 1982 | Life |
| 22 | 18 U.S.C. § 1651 | Piracy under the laws of the nation | 1790 | Life |
| 23 | 18 U.S.C. § 1652 | Piracy by U.S. citizen | 1790 | Life |
| 24 | 18 U.S.C. § 1653 | Piracy against the United States by an alien | 1790 | Life |
| 25 | 18 U.S.C. § 1655 | Piracy in the form of assault on a commander | 1790 | Life |
| 26 | 18 U.S.C. § 1661 | Robbery ashore by a pirate | 1790 | Life |
| 27 | 18 U.S.C. § 1751(a) (§§2A1.1, 2A1.2, 2A1.3, 2A1.4) | Killing the President of the United States, the next in order of succession to the Office of the President, or any person who is acting as the President of the United States; or any person employed in the Executive Office of the President or Office of the Vice President | 1965 | Life** |
| 28 | 18 U.S.C. § 1958(a) (§2E1.4) | Causing death through the use of interstate commerce facilities in the commission of a murder-for-hire | 1984 | Life** |
| 29 | 18 U.S.C. § 1992 | Wrecking train carrying high level nuclear waste and thereby causing death | 2006 | Life** |
| 30 | 18 U.S.C. § 2113(e) (§§2A1.1, 2B3.1) | Causing death in the course of a bank robbery, avoiding | 1934 | Life** |

| | Statute (Guideline) | Description | Date Enacted[35] | Minimum Term[36] |
|---|---|---|---|---|
| | | apprehension for a bank robbery, or escaping custody after a bank robbery | | |
| 31 | 18 U.S.C. § 2241(c) (§2A3.1) | Second or subsequent offense, engaging in a sexual act with a child under the age of 12, or engaging in a sexual act by force with a child who is above the age of 12, but under the age of 16 | 1986 | Life** |
| 32 | 18 U.S.C. § 2332g (§2K2.1) | If death of another results from knowingly produc[ing], acquir[ing], transferr[ing], or possess[ing] missile systems designed to destroy aircraft | 2004 | Life |
| 33 | 18 U.S.C. § 2332(h)(c)(3) (§2M6.1) | If death results from knowingly produc[ing], acquir[ing], transferr[ing], or possess[ing] any weapon designed to release radiation or radioactivity at a level dangerous to human life | 2004 | Life |
| 34 | 18 U.S.C. § 3559(c)(1) | Upon conviction for a serious violent felony, if offender has two or more prior serious violent felony convictions, or one or more prior serious violent felony convictions and one or more prior serious drug offense conviction | 2003 | Life[†,††] |
| 35 | 18 U.S.C. § 3559(d)(1) | If the death of a child less than 14 years results from a serious violent felony | 2003 | Life |
| 36 | 18 U.S.C. § 3559(e)(1) | Where a federal sex offense committed against a minor and the offender has a prior sex conviction in which minor was a victim. | 2003 | Life**,[†] |
| 37 | 21 U.S.C. § 461(c) (§2N2.1) | Killing any person engaged in or on account of performance of his official duties as poultry or poultry products inspector. | 1957 | Life** |
| 38 | 21 U.S.C. § 675 (§§2A1.1, 2A1.2, 2A1.3, 2A1.4, 2A1.2, 2A2.3) | Killing any person engaged in or on account of performance of his official duties as a meat inspector | 1907 | Life** |
| 39 | 21 U.S.C. § 841(b)(1)(A) (§2D1.1) | Second offense manufacturing, distributing, or possessing a controlled substance or counterfeit substance with intent to distribute, if death or serious bodily | 1986 | Life*,[†] |

| | Statute (Guideline) | Description | Date Enacted[35] | Minimum Term[36] |
|---|---|---|---|---|
| | | injury results from the use of such substance  21 U.S.C. §§ 859(b) (distribution to a person under the age of 21), 860(b) (distribution or manufacture in or near a school or college), and 861(c) (employing or using a person under the age of 21 to engage in a controlled substance offense) all incorporate the minimum terms set by § 841(b)(1)(A). | | |
| 40 | 21 U.S.C. § 841(b)(1)(A) (§2D1.1) | Third offense, manufacturing, distributing, or possessing a controlled substance or counterfeit substance with intent to distribute  21 U.S.C. §§ 859(b) (distribution to a person under the age of 21), 860(b) (distribution or manufacture in or near a school or college), and 861(c) (employing or using a person under the age of 21 to engage in a controlled substance offense) all incorporate the minimum terms set by § 841(b)(1)(A). | 1986 | Life*,† |
| 41 | 21 U.S.C. § 841(b)(1)(B) (§2D1.1) | Second or any subsequent offense, manufacturing, distributing or possessing a controlled substance or counterfeit substance with intent to distribute, death or serious bodily injury results  21 U.S.C. §§ 859(b) (distribution to a person under the age of 21), 860(b) (distribution or manufacture in or near a school or college), and 861(c) (employing or using a person under the age of 21 to engage in a controlled substance offense) all incorporate the minimum terms set by § 841(b)(1)(A). | 1984 | Life*,† |

| | Statute (Guideline) | Description | Date Enacted[35] | Minimum Term[36] |
|---|---|---|---|---|
| 42 | 21 U.S.C. § 848(b) (§2D1.5) | Any offense; principal, administrator, organizer, or leader ("kingpin") of continuing criminal enterprise | 1986 | Life** |
| 43 | 21 U.S.C. § 960(b)(1) (§2D1.5) | Second or any subsequent offense, unlawful import or export of controlled substance, death or serious bodily injury results | 1986 | Life*,† |
| 44 | 21 U.S.C. § 960(b)(2) | Second or any subsequent offense, unlawful import or export of controlled substance, death or serious bodily injury results | 1986 | Life† |
| 45 | 21 U.S.C. § 960(b)(3) | Second or any subsequent offense, unlawful import or export of controlled substance, death or serious bodily injury results | 1986 | Life† |
| 46 | 21 U.S.C. § 1041(b) | Killing any person engaged in or on account of performance of his official duties under Chapter 15-Eggs Product Inspection | 1970 | Life** |
| 47 | 42 U.S.C. § 2272(b) (§2M6.1) | Violation of prohibitions governing atomic weapons; death of another resulting | 1954 | Life |
| 48 | 49 U.S.C. § 46502(a)(2)(B) (§§2A5.1, 2X1.1) | Committing or attempting to commit aircraft piracy in special aircraft jurisdiction of the U.S.; resulting in death of another individual | 1958 | Life** |
| 49 | 49 U.S.C. § 46502(b)(1)(B) (§§2A5.1, 2X1.1) | Violation of Convention for the Suppression of Unlawful Seizure of Aircraft outside special aircraft jurisdiction of U.S.; resulting in death of another individual | 1958 | Life** |

* Safety valve applies (18 U.S.C. § 3553(f)), allowing for sentencing below the mandatory minimums for certain low-level, first-time offenders.
** Statute also permits the imposition of the death penalty.
† Recidivism required for the mandatory term of life imprisonment to apply.
†† 18 U.S.C. § 3582(c)(1), commonly known as the "compassionate release" provision, applies. This provision allows certain criminals to be released at age 70 if they have served at least 30 years in prison.

If one approaches the analysis under this second step from another angle, one arrives at the same conclusion. That is, if one looks to offenses far graver than those Rivera-Ruperto

committed, one finds that they carry far less severe sentences than Rivera-Ruperto's. In sentencing to a mandatory term of 55 years a defendant who had committed three offenses under § 924(c), Judge Cassell compiled a table of offenses under federal law that would result in a shorter sentence than those 55 years -- but were clearly graver than the defendant's offenses. Judge Cassell's comparison applies even to Rivera-Ruperto's considerably longer sentence. Examples from his table include "an aircraft hijacker (293 months), a terrorist who detonates a bomb in a public place (235 months), a racist who attacks a minority with the intent to kill and inflicts permanent or life-threatening injuries (210 months), a second-degree murderer, or a rapist." United States v. Angelos, 345 F. Supp. 2d 1227, 1244-45 (D. Utah 2004), aff'd, 433 F.3d 738 (10th Cir. 2006). Judge Cassell went on to compare the sentence before him to triple offenders, and arrived at the conclusion that,

> [a]mazingly, [the Defendant's] sentence under § 924(c) is still far more severe than criminals who committed, for example, three aircraft hijackings, three second-degree murders, three kidnappings, or three rapes. . . . [Defendant] will receive a longer sentence than any three-time criminal, with the sole exception of a marijuana dealer who shoots three people. ([The defendant] still receives a longer sentence than a marijuana dealer who shoots two people.)

Id. at 1246.

Similarly telling is a comparison to the federal three-strikes provision, 18 U.S.C. § 3559(c).  This statute mandates that a court impose a sentence of LWOP on a criminal with two prior serious violent felony convictions when this criminal commits a third such offense -- but such an offender can then be released at age 70 if he has served at least 30 years in prison under 18 U.S.C. § 3582(c)(1), the so-called "compassionate release clause."  That is, if Rivera-Ruperto had committed a violent felony, been convicted, then committed a second violent felony, then been convicted again, and then committed a third violent felony, and been convicted yet again, he -- even though a seemingly incorrigible recidivist -- would have been eligible for release at age 70.  As a first-time offender sentenced under § 924(c), however, Rivera-Ruperto will never be eligible for release.[37]

_____

[37]  See also Angelos, 345 F. Supp. 2d at 1250-51 ("The irrationality only increases when section § 924(c) is compared to the federal 'three strikes' provision. Criminals with two prior violent felony convictions who commit a third such offense are subject to 'mandatory' life imprisonment under 18 U.S.C. § 3559(c)--the federal 'three-strikes' law. But then under 18 U.S.C. § 3582(c)(1)--commonly known as the 'compassionate release' provision--these criminals can be released at age 70 if they have served 30 years in prison. But because this compassionate release provision applies to sentences imposed under § 3559(c)--not § 924(c)--offenders like [the Defendant] are not eligible. Thus, while the 24-year-old [Defendant] must serve time until he is well into his 70's, a 40-year-old recidivist criminal who commits second degree murder, hijacks an aircraft, or rapes a child is potentially eligible for release at age 70. In other words, mandatory life imprisonment under the federal three-strikes law for persons guilty of three violent felony convictions is less mandatory than mandatory time imposed on the first-time offender under § 924(c).

At the third, and final, step of the analysis, "the court should . . . compare [Rivera-Ruperto's sentence] . . . with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." Graham, 560 U.S. at 60 (internal citations omitted). Rivera-Ruperto's case also clears this final step without difficulty. Sentences for offenses like Rivera-Ruperto's are much lower under state law.[38] (This brings with it a number of serious

_____

Again, the rationality of this arrangement is dubious.

This possibility, too, is no mere hypothetical. This morning, the court had before it for sentencing Thomas Ray Gurule. Mr. Gurule is 54-years-old with a lifelong history of criminal activity and drug abuse. He has spent more of his life incarcerated than he has in the community. He has sixteen adult criminal convictions on his record, including two robbery convictions involving dangerous weapons. His most recent conviction was for carjacking. In August 2003, after failing to pay for gas at a service station, Mr. Gurule was pursued by the station manager. To escape, Mr. Gurule broke into the home of a young woman, held her at knife point, stole her jewelry, and forced her to drive him away from the scene of his crimes. During the drive, Mr. Gurule threatened both the woman and her family.

For this serious offense--the latest in a long string of crimes for which he has been convicted--the court must apparently sentence Mr. Gurule to "life" in prison under 18 U.S.C. § 3559(c). But because of the compassionate release provision, Mr. Gurule is eligible for release after serving 30-years of his sentence. Why Mr. Gurule, a career criminal, should be eligible for this compassionate release while [the Defendant is not] is not obvious to the court.").

[38] Erik Luna and Paul Cassell, Mandatory Minimalism, 32 Cardozo L. Rev. 1, 16 (2010) ("Most drug and weapons crimes amenable to federal mandatory minimums are actually prosecuted in state courts pursuant to state laws carrying much lower

issues, such as prosecutors choosing to bring cases in federal court merely because of the higher sentences -- but such issues are not the focus of this dissent.).[39]  There is also some suggestion that courts may need to look to foreign law in this step of the analysis.  In cases involving the second classification of Eighth Amendment challenges -- applying categorical restrictions on the death penalty or LWOP -- the Supreme Court "has looked beyond our Nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual. . . . Today we continue that longstanding practice in noting the global consensus against the sentencing practice in question."  Graham, 560 U.S. at 80.  It is unclear whether in the first classification of Eighth Amendment challenges -- such as the as-applied challenge before us today -- courts should also look to

_____

sentences.") (emphasis added).

[39]  Id. ("It is hardly disputed, however, that the possibility of severe punishment can influence the choice of whether to pursue a federal or state prosecution. For some, this prospect raises serious questions about the propriety of bringing charges in federal rather than state court, particularly where the prosecution is pursued, not because the case implicates a special national interest, but because it jacks up the potential punishment."). See also Angelos, 345 F. Supp. 2d at 1243 ("Indeed, the government conceded that [the Defendant's] federal sentence [of 55 years in prison] after application of the § 924(c) counts is more than he would have received in any of the fifty states."); Id. at 1259 ("[Defendant's] sentence [of 55 years under § 924(c)] is longer than he would receive in any of the fifty states. The government commendably concedes this point in its brief, pointing out that in Washington State [the Defendant] would serve about nine years and in Utah would serve about five to seven years.").

foreign law.  I therefore note that foreign law further supports the proposition that Rivera-Ruperto's sentence is out of proportion to his crime, for "LWOP . . . scarcely exists elsewhere in the world. Yet today, the number of defendants sentenced to LWOP by American courts approaches 50,000. . . .  In fact, what separates the American criminal justice system from the rest of the world, and brands it as distinctively harsh, is the number of inmates dispatched to prison for the duration of their lives, without offering a legal mechanism for freedom."[40]  Indeed, Germany, France, and Italy have declared LWOP to be unconstitutional, and other European countries apply it only very rarely.[41]

---

[40]  Craig S. Lerner, Who's Really Sentenced to Life Without Parole?:  Searching for "Ugly Disproportionalities" in the American Criminal Justice System, 2015 Wis. L. Rev. 789, 792 (2015). See Ashley Nellis, Throwing Away the Key: The Expansion of Life without Parole Sentences in the United States, Fed. Sent'g. Rep. 23(1) (2010), 2010 WL 6681093 at *30 ("In many other industrialized nations, serious offenders are typically released after a maximum prison term of no more than thirty years. For instance, in Spain and Canada, the longest sentence an offender can receive is twenty-five or thirty years. In Germany, France, and Italy, LWOP has been declared unconstitutional. In the United Kingdom, it is allowable, but used quite sparingly; according to a recent estimate, only twenty-three inmates were serving this sentence. In Sweden, parole-ineligible life sentences are permissible, but never mandatory. The Council of Europe stated in 1977 that 'it is inhuman to imprison a person for life without the hope of release,' and that it would 'be compatible neither with the modern principles on the treatment of prisoners . . . nor with the idea of the reintegration of offenders into society.'") (footnotes omitted).

[41] Id.

## B. Additional Observations

The analysis could stop here. But because this is such a rare case, a few additional observations are in order.

### 1. Direct Comparison to Other Cases

A direct comparison of Rivera-Ruperto's offense and its sentence to offenses and their sentences that the Supreme Court held constitutional is enlightening. There are five such cases. See supra, Section I.C.3. Four of these cases involve recidivists -- and the Supreme Court weighed the recidivism heavily in its proportionality analysis. See id. The fifth case involved a career criminal, another important factor in determining the appropriate sentence. See id. However, Rivera-Ruperto is neither a recidivist nor a career criminal. He is a first-time offender who has not led a life of crime. I therefore place his crime on one side of the scales -- without adding the weight of recidivism or a career of crime -- and his sentence on the other. And the weight of the sentence dwarfs the weight of his offense.

Such a direct comparison also holds if the present case is compared to cases from other circuits. The Government, in its 28j letter, has provided this court with eleven cases of sentences from 55 to 186 years given under § 924(c).[42] The Government notes

---

[42] To wit: United States v. Wiest, 596 F.3d 906 (8th Cir. 2010); United States v. McDonel, 362 F. App'x 523 (6th Cir. 2010); United States v. Walker, 437 F.3d 71 (3d Cir. 2007); United States v. Watkins, 509 F.3d 277 (6th Cir. 2007); United States v. Khan,

that these lengthy sentences were "based largely on recidivist violations of § 924(c)." In fact, only three of these cases concerned recidivist offenders; six involved career criminals; the final one involved terrorists who were involved in, inter alia, planning the attacks on 9/11. It is telling indeed that in providing this court with cases in which sentences of comparable length to Rivera-Ruperto's weathered Eighth Amendment challenges, the Government has presented this court with such grave offenses as:

---

461 F.3d 477 (4th Cir. 2006); United States v. Angelos, 433 F.3d 738 (10th Cir. 2006); United States v. Hungerford, 465 F.3d 1113 (9th Cir. 2006); United States v. Beverly, 369 F.3d 516 (6th Cir. 2004); United States v. Marks, 209 F.3d 577 (6th Cir. 2000); United States v. Arrington, 159 F.3d 1069 (7th Cir. 1998). The Government also cites United States v. Hernández-Soto, No. 12-2210 (1st Cir. Aug. 19, 2015); although Hernández-Soto did involve a lengthy sentence, there was no Eighth Amendment challenge in that case, and I therefore do not consider it here. Finally, the Government cites United States v. Polk, 546 F.3d 74 (1st Cir. 2008), a case in which this court rejected an Eighth Amendment challenge to a fifteen-year sentence imposed under 18 U.S.C. § 2251(e). The defendant in Polk had engaged in online conversation with a person he thought was a 13-year-old girl, and he pressured her to take sexually explicit photographs of herself and to send them to him. In addition, "The presentence investigation report told a seamy story: it revealed an earlier conviction for aggravated sexual assault on a toddler, sexual involvement with teenage girls on at least two occasions, and yet another series of sexually charged computer chats with a minor. The defendant conceded these facts . . . ." Polk, 546 F.3d at 75. I see no difficulty in reconciling the proposition that Polk's sentence of 15 years did not violate the Eighth Amendment with the proposition that Rivera-Ruperto's sentence of, effectively, LWOP, does violate the Eighth Amendment.

- Seven bank robberies (in four of which a firearm was brandished) by "a repeat bank robber whose criminal record reflects a life of violent crime interrupted only by terms of imprisonment." Arrington, 159 F.3d at 1073.

- A defendant who "was convicted of six separate robberies, each of which involved the brandishing of a firearm." Watkins, 509 F.3d at 283. Although a first-time offender, the defendant "and/or his accomplices entered the homes of victims by force and threatened to seriously harm or kill not only the victims, but, in multiple cases, their spouses and small children." Id.

- Defendants who were involved in the planning of the terrorist attack on 9/11 and who were convicted on "various counts related to a conspiracy to wage armed conflict against the United States and a conspiracy to wage armed conflict against a country with whom the United States is at peace." Khan, 461 F.3d at 83.

Thus, the Government confirms that when long sentences are applied to serious offenses by recidivists, career criminals, or terrorists, the Eighth Amendment does not protect the offenders, for the severe punishment is not grossly disproportionate to the grave crimes. But Rivera-Ruperto is a first-time offender; he is no career criminal; and he is no terrorist. Note that even in the case of recidivist, but minor, offenses, the punishment may violate

the Eighth Amendment. See <u>Ramírez</u> v. <u>Castro</u>, 365 F.3d 755 (9th Cir. 2004) (holding that a sentence of 25 years to life for a third shoplifting offense violated the Eighth Amendment).

### 2. Penological Goals

There is also a suggestion in the case law that courts may consider penological goals in their analysis, specifically: deterrence, retribution, rehabilitation, and incapacitation. <u>Ewing</u>, 538 U.S. at 24. As for deterrence, harsh punishment can have a deterrent effect, but deterrence alone cannot justify disproportionate punishment: "The inquiry focuses on whether, a person deserves such punishment, not simply on whether punishment would serve a utilitarian goal. A statute that levied a mandatory life sentence for overtime parking might well deter vehicular lawlessness, but it would offend our felt sense of justice". <u>Rummel</u>, 445 U.S. at 288 (Powell, J., dissenting). As for retribution, it is not clear how Rivera-Ruperto has caused any injury -- for the transaction was a sham -- but even if one ignores that obstacle, Rivera-Ruperto clearly caused less of an injury than those who receive LWOP under federal law, or, for that matter, than those who receive a lesser punishment under federal law. <u>See</u> <u>supra</u>, Section II.A. Indeed, had Rivera-Ruperto been a drug dealer himself, and transacted a vast quantity of real drugs in a single transaction to which he brought a gun, he would undoubtedly have received a much lower sentence. <u>Id.</u> Rehabilitation is clearly

not served here, because the current sentence means that the law has judged Rivera-Ruperto to be beyond rehabilitation -- something that may be understandable in the case of recidivists who have demonstrated that punishment does not change their ways -- but it is troubling indeed to say that a first-time offender will not be given a chance to learn from his mistakes. Finally, as to incapacitation, Rivera-Ruperto does not present such a danger to society that society needs to be protected from him forever.

This analysis of penological goals highlights another facet of the present case that deserves pause. Rivera-Ruperto's offenses involved a sham drug transaction, at which sham drugs were transacted. "Proportionality--the notion that the punishment should fit the crime--is inherently a concept tied to the penological goal of retribution." Ewing, 538 U.S. at 31 (Scalia, J., concurring). But Rivera-Ruperto did no injury, and retribution is therefore not in order. This affects the proportionality analysis. For the purposes of proportionality, participation in a sham drug deal and a real drug deal weigh differently, because retribution applies in the latter, but not in the former. That is not to say that when a sentence is given out for a sham drug deal as if it were a real drug deal, then that sentence necessarily violates the Eighth Amendment. For while such a sentence might be disproportionate, it would not necessarily be "grossly disproportionate" so as to violate the Eighth Amendment. But as

the length of a sentence for a sham deal is multiplied, so is its disproportionality.  This is simply arithmetic and common sense.

### 3.  The Legislature's Judgment

The three-step analysis already incorporates due respect for the judgment of the legislature as to the severity of penalties, and, as shown above, Rivera-Ruperto's case passes that analysis.  Because the judgment of the legislature deserves great deference, however, it is worth pointing out that, on the particular facts of this case, I am not questioning the judgment of the legislature.  Rather, § 924(c), as the late Chief Justice Rehnquist pointed out, presents a good example of "unintended consequences" of legislative action.[43]  Indeed, § 924(c) was the result of a floor amendment (so there is no legislative history) passed by a legislature that wanted to appear tough on gun crime soon after the assassinations of Robert Kennedy and Martin Luther King, Jr.[44]  Not only were the minimums in that law much lower than they have become since, but -- crucially -- the law was understood as a recidivist statute for a good 25 years.  It was not until

---

[43]  William H. Rehnquist, Luncheon Address (June 18, 1993), in U.S. Sentencing Comm'n., Proceedings of the Inaugural Symposium on Crime and Punishment in the United States, 286 (1993).

[44]  Judge Paul Cassell, Statement on Behalf of the Judicial Conference of United States from U.S. District Judge Paul Cassell before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security, 2007 WL 3133929, Fed. Sent'g. Rep. 19(5) (2007) at *347.

Deal v. United States, 508 U.S. 129 (1993), that the statute became applied the way it is today -- not as a recidivist statute, but rather as one that requires stacking of mandatory minimums on first-time and recidivist offenders alike. Not only is this court generally cautious to infer anything from Congressional inaction, but in this case, it would not even make sense to try. For Congress's inaction cuts both ways: for the first 25 years after § 924(c) was enacted, the statute applied to recidivists only; after Deal, that changed -- but Congress did not act on either understanding of the statute. Furthermore, as has been pointed out countless times, applications of § 924(c) such as in the case before us today contravene the intent of Congress in many ways: most importantly, § 924(c) has led to significant sentencing disparity, directly contradicting the intent behind the major sentencing reform of the 1980s. See, e.g., Stephen Breyer, Federal Sentencing Guidelines Revisited, 1999 WL 730985, Fed. Sent'g. Rep. 11(4)(1999). This is yet another facet of the present case that distinguishes it from this court's decision in, for instance, Polk. See supra, n.20. In that case, this court was faced with a harsh sentence -- but that sentence was clearly so intended by Congress, Congress had clearly resolved that the offense in question deserved that harsh penalty. But in the present case, this court is faced not with a Congressional assessment of the gravity of this offense,

but rather with an unintended consequence of a statute hastily implemented and judicially altered.

### III. Conclusion

The present case is "hen's-teeth rare". Polk, 546 F.3d at 76. It may very well be even rarer than that. I would hold that Rivera-Ruperto's sentence violates the Eighth Amendment. Indeed, the present case is so rare that it is distinguishable from the cases in which the Supreme Court rejected Eighth Amendment challenges to sentences for a term of years (already rare cases), and it is also distinguishable from cases the Government cited in which other circuits rejected Eighth Amendment challenges to sentences under § 924(c) (also rare cases). Never before has a first-time offender who has not dedicated his life to crime been condemned to spend his entire life in prison for a transgression such as Rivera-Ruperto's, not even in cases in which the transgression was real -- and Rivera's-Ruperto's transgression is fictitious.

The Government has effectively asked this court to pronounce the Eighth Amendment dead for sentences for a term of years. I respectfully refuse to join in this pronouncement. "Unless we are to abandon the moral commitment embodied in the Eighth Amendment, proportionality review must never become effectively obsolete." Graham, 560 U.S. at 85 (Stevens, Ginsburg, Sotomayor, JJ., concurring).